UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**LESLIE BETTICE,**

               **Plaintiff,**

**v.**                                             **Case No. 5:17-CV-0904-JKP**

**CITY OF NEW BRAUNFELS,**

               **Defendant.**

## MEMORANDUM OPINION AND ORDER

The Court has under consideration *Defendant City of New Braunfels' Motion for Summary Judgment* (ECF No. 39). Following Plaintiff's response (ECF No. 40) and the City's reply (ECF No. 41), the motion is fully briefed, including evidence submitted by both sides.[1] For the reasons that follow, the Court grants the motion.

## I. BACKGROUND[2]

After being hired by the City of New Braunfels Police Department in August 2007, Plaintiff worked her way from patrol officer to a member of the Gang Offender Narcotic Enforcement Unit to Narcotic Detective. *See* Pl.'s Decl. (ECF No. 40-1) at 5. Defendant selected her for the latter two positions through competitive selection processes.

In her sworn declaration, Plaintiff chronicles numerous incidents relevant to her claims commencing in October 2007. *See*, *generally*, *id.* at 7-12. In that month, her Field Training Officer ("FTO"), Victor Rocha, propositioned her several times, made crude and sexual comments

---

[1] Defendant has submitted an Internal Affairs Investigation (Ex. A, ECF No. 39-1), a Declaration of Chief of Police Tom Wibert and his deposition (Exs. B and C, ECF No. 39-2 and 39-3), and the deposition of Plaintiff (Ex. D, ECF No. 39-4). Plaintiff has provided her own sworn declaration (ECF No. 40-1).

[2] The background facts are viewed in the light most favorable to Plaintiff as required by the standard for summary judgment motions.

about nearly every woman he saw, told her to contact dispatch every time she needed to use the bathroom because "females just take longer than males," and gave her several poor marks. *Id*. at 7-8. After she filed a grievance, Rocha was replaced as her FTO, and was later promoted to Senior FTO and then Sergeant. *Id*. at 8. The filed grievance is "nowhere to be found." *Id*. That same month, Plaintiff had a gun/safety vest issue with Corporal James Bell, which she believes was inappropriate and would have been handled differently had she been a male. *Id*. Although Plaintiff did not personally file a grievance on this issue, a fellow officer did on her behalf. *Id*.

Throughout 2007 and 2008, Plaintiff endured continued false rumors of sexual relations with many officers. *Id*. Her verbal grievances were met with laughter or instructions to ignore the rumors. *Id*. In September 2008, she received an email from another officer's (Coty Butcher) wife accusing her of having an affair with her husband. *Id*. Her filed grievance led to a talk with the officer but no other action. *Id*. In late 2008, she was one of the last officers to receive a new patrol unit even though officers were supposed to be assigned based upon seniority. *Id*. at 9. In April 2009, she was replaced by a male in an expensive investigator class because she was pregnant and might leave the department after the birth of the child. *Id*. On August 23, 2010, she received verbal counseling regarding "the blow out of two tires due to checking [her] computer on the way to a call," when "male officers have had many accidents without being issued a counseling or write up." *Id*. at 2.

Without connecting the evaluation with sexual harassment in any way, Plaintiff next states that she received a "below average" rating as an officer in November 2013. *Id*. at 9. Three months later, Corporal Mark Christiansen[3] filed a complaint against her for insubordination related to an order regarding collecting EKG strips and the complaint led Chief Wibert to write her

---

[3] Plaintiff identifies this Officer as Christiansen and Christian. *See* Pl.'s Decl. at 2, 9. The Court utilizes the spelling that Plaintiff first used.

up. *Id*. at 2, 9. She next documents an off-duty encounter with Officer David Cantu in November 2014, when he was intoxicated, repeatedly made propositions and other sexual comments to her, and ultimately bribed her for sex with an offer for her to get into the narcotics unit. *Id*.at 10. When she refused that offer, he told her "that refusing to have sex with him would be the reason [she] didn't get in the Narcotic Unit." *Id*. Rather than file a complaint about this incident, Plaintiff asked for advice from a Sergeant. *Id*.

In March 2015, Plaintiff was counseled because she was late to work when many "male officers have also been late to work without issue." *Id*. at 2. Two months later, someone complained that she was racial profiling. *Id*. at 9. After that complaint was cleared, Officer Steven Hannah made a complaint regarding an illegal search, which he sustained but rather than impose punishment, he directed Plaintiff to attend a search/seizure class. *Id*. at 2, 10-11. The next month, Plaintiff made a sexual harassment complaint on behalf of Officer Werthen, a female officer allegedly sexually harassed by Officer Rocha. *Id*. at 11. Plaintiff did not file a grievance and Officer Rocha instituted an unfounded complaint against her. *Id*. That same month, Plaintiff was selected for the gang unit. *Id*. at 5.

In January 2016, a male applicant was selected for an opening in the narcotics unit and Plaintiff lost a pay increase from his selection even though she "was ranked number one on the selection list" by "several of the deputies on the board." *Id*. at 1-2. She did not file a grievance due to fear of retaliation and because a second position would be available within a few months. *Id*. at 2. She was selected for the second opening in April 2016. *Id*. at 5. In May of that year, she learned of a second investigation regarding Rocha. *Id*. at 11. On June 14, 2016, she filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). *Id*.

A year later, on June 16, 2017, Plaintiff received a right to sue letter regarding that charge. *Id*. The next month, the Drug Enforcement Agency showed interest in her for a taskforce but Chief Wibert refused the request because he wanted to select who went to the taskforce. *Id*. at 11-12. His refusal conflicted with a similar request for a male officer. *Id*. at 12. In August 2017, the San Antonio Police Department showed interest in her for a taskforce assignment that Chief Wibert also refused. *Id*.

That same month, Plaintiff was involved in getting a search warrant related to a narcotics operation which required that all warrants be presented to District Attorney ("DA") Jennifer Tharp for approval prior to being tendered to State District Judge Jack Robison. *Id*. at 2; Letter from Wibert to Plaintiff and Commissioners (Feb. 1, 2018) (on file as ECF No. 39-1 at 1-4) (hereinafter "Termination Letter"). Sergeant Cantu of the Narcotics Unit had informed her that all warrants had to go through the DA's Office. Pl.'s Decl. at 2. He also ordered her to get the search warrant that ultimately led to her termination. *Id*. at 2-3, 12.

During the course of that operation, Plaintiff presented a search warrant to the DA concerning a suspect's residence wherein the search warrant covered both forfeiture and probable cause. *Id*. at 2-3. The DA did not approve the warrant and told Plaintiff not to present it to the Judge until the DA did further legal research. *Id*. at 3. According to Plaintiff, Cantu ordered her to get the warrant completed even though the DA had not approved it. *Id*. Cantu believed the DA's office was causing problems with the warrants. *Id*. After he ordered her to complete the warrant, she again tried to obtain approval before going to the Judge for his signature. *Id*. When she met with Judge Robison, she truthfully explained that the DA had not yet approved the warrant, but it would not be executed without her approval. *Id*. at 3-4. He signed the warrant after that explanation. *See id*.

On August 30, 2017, Chief Wibert received a letter from the DA regarding the actions of Plaintiff in securing the Judge's signature on the warrant. *See* Termination Letter at 2. On September 13, 2017, the department commenced an internal investigation into the circumstances of that warrant, *see* New Braunfels Police Dep't Personnel Compl. (on file as ECF No. 39-1 at 20-21); *accord* Pl's Decl. at 12, and Chief Wibert placed her "on administrative leave effective immediately pending the outcome of this internal investigation," Letter from Wells to Wibert (Jan. 3, 2018) (on file as ECF No. 39-1 at 5-18) at 5. Plaintiff commenced this civil litigation on September 14, 2017, alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e-17. *See* Compl. (ECF No. 1).

On February 1, 2018, Plaintiff was placed on indefinite suspension. Pl.'s Decl. at 1, 12; Termination Letter at 1. The letter informs Plaintiff of two related grounds for dismissal – insubordination and violations of rules and regulations. Termination Letter at 1-2. The decision was affirmed by the Civil Service Commission on March 19, 2018. Pl.'s Decl. at 12. She filed a second EEOC charge on April 11, 2018, resulting in a second right to sue letter received on November 11, 2018. *Id.*

In December 2018, the Court granted her unopposed motion to amend her complaint. *See* Order (ECF No. 14). Plaintiff's First Amended Complaint (ECF No. 15) is now the operative pleading. In that complaint, Plaintiff alleges (1) a sexual harassment complaint made in 2007; (2) she filed a grievance about ongoing sexual harassment by FTO Rocha in 2015; (3) the FTO filed a grievance that commenced an Internal Affairs investigation on September 11, 2015, and the grievance against her was found to be unfounded; (4) as a result of information discovered during that investigation, a second investigation was commenced against the FTO in May 2016; and in retaliation, another unfounded complaint was filed against Plaintiff; and (5) she was terminat-

ed on August 7, 2017. First Am. Compl. ¶¶ 14-22. She further alleges that she was treated less favorably than similarly situated male employees, including when she was bypassed for a pay-increasing, narcotics position even though she was ranked first after the process. *Id.* ¶ 23. She obtained a second narcotics position four months later. *Id.* She also alleges almost weekly harassment based on her sex thus creating a pervasively hostile work environment. *Id.* ¶ 24. Lastly, she asserts that Defendant subjected her to ongoing retaliation since she opposed discrimination in mid-2015. *Id.* ¶ 25. She asserts three causes of action under Title VII: (1) sex discrimination, (2) hostile work-environment, and (3) retaliation. *Id.* ¶¶ 26-31.

On September 24, 2020, Defendant filed the motion for summary judgment now before the Court. With the reply brief filed on October 13, 2020, the motion is ripe for ruling. Essentially, the City contends that it fired Plaintiff for lying to Judge Robison concerning the warrant and Plaintiff contends she endured a hostile work environment and suffered adverse employment actions, including being fired based on discrimination and in retaliation for opposing discrimination. Defendant moves for summary judgment on all of Plaintiff's claims.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable

---

[4] The summary judgment standard "remains unchanged" despite 2010 amendments to Fed. R. Civ. P. 56 that replaced "issue" with "dispute." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.). Although the standard remains the same, the Court utilizes the amended terminology even when relying on caselaw that predates the amendments.

jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

### III. TITLE VII

Title VII makes it unlawful for covered employers to discriminate against individuals with respect to their "terms, conditions, or privileges of employment, because of [their] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Except as otherwise provided in this subchapter [(Subchapter VI of Title 42 of the United States Code, which encompasses

all provisions of Title VII)], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id*. § 2000e-2(m).

Title VII also prohibits employers from retaliating against an employee for (1) opposing any employment practice made unlawful by its provisions and (2) making a charge, testifying, assisting, or participating in "in any manner in an investigation, proceeding, or hearing" under its provisions. *Id*. § 2000e-3(a). "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Plaintiffs may prove Title VII claims of "intentional discrimination or retaliation either by direct or circumstantial evidence." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *accord Stroy v. Gibson ex rel. Dep't of Veterans Affairs*, 896 F.3d 693, 698 (5th Cir. 2018) (discrimination case). When analyzing Title VII claims of disparate or discriminatory treatment, courts utilize the burden-shifting framework set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) unless there is direct evidence of discrimination. *See Stroy*, 896 F.3d at 698. That same "framework applies to Title VII retaliation claims brought under a pretext theory." *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *accord Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015). Not only does this framework apply at trial, *see McDonnell*, 411 U.S. at 802, but it also applies on summary judgment, *see Vaughn v. Woodforest Bank*, 665 F.3d 632, 635-36 (5th Cir. 2011).

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Palacios v. City of Crystal City*, 634 F. App'x 399, 402 (5th Cir. 2015) (per curiam) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993)). "If an inference is required for the evidence to be probative . . . the evidence is circumstantial, not direct." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897-98 (5th Cir. 2002).

Under the *McDonnel Douglas* framework, plaintiffs must first establish "by the preponderance of the evidence a prima facie case of discrimination," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981), or retaliation, *McCoy*, 492 F.3d at 556-57. Carrying this initial burden creates an inference or presumption of discrimination, *see Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978), or retaliation, *see Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253; *accord Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012) (quoting *Burdine*). Nor is it onerous in the retaliation context. *See Manning v. Chevron Chem. Co.*, LLC, 332 F.3d 874, 883 n.6 (5th Cir. 2003); *Arismendiz v. Univ. of Tex. at El Paso*, 536 F. Supp. 2d 710, 716 (W.D. Tex. 2008) (FMLA context). The prima facie case is flexible and necessarily varies in Title VII cases depending on the particular circumstances. *Burdine*, 450 U.S. at 253 n.6.

In general, to establish a prima facie case of discrimination, the plaintiff must show (1) membership in a protected group; (2) "qualified for the position at issue"; (3) an "adverse employment action by the employer"; and (4) being replaced by someone outside the protected group or being "treated less favorably than other similarly situated employees outside the pro-

tected group." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). When the plaintiff asserts discrimination based upon non-selection for a position, the adverse action is the non-selection. *See Furnco Constr. Corp.*, 438 U.S. at 575-77. "In work rule violation cases, a Title VII plaintiff may establish a prima facie case by showing either (1) that she did not violate the rule or (2) that if she did, other employees who engaged in similar acts were not punished similarly." *Turner*, 675 F.3d at 892-93.

The prima facie case in the retaliation context requires the plaintiff to establish: (1) participation "in an activity protected by Title VII"; (2) "an adverse employment action" by the employer; and (3) "a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 556-57; *accord Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016). The third element requires only that the plaintiff "demonstrate a 'causal connection' between [the] protected activity and [the adverse action], even if [the plaintiff] must ultimately demonstrate but-for causation at the pretext stage of the *McDonnell Douglas* framework." *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019); *accord Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020), *as revised* (Aug. 14, 2020); *but see*, *Harville v. City of Houston, Miss.*, 945 F.3d 870, 879 (5th Cir. 2019) (identifying "a but-for causal connection" in the prima facie case).[5]

Once the plaintiff establishes the prima facie case, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy*, 492 F.3d at 557; *accord Wheat*, 811 F.3d at 710 (retaliation claim). This "burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy*, 492 F.3d at

---

[5] The Court follows *Garcia*. Not only does earlier precedent apply in general, *see Silo Rest. Inc. v. Allied Prop. & Cas. Ins. Co.*, 420 F. Supp. 3d 562, 576 (W.D. Tex. 2019), but *Garcia* also thoroughly discusses the issue and relies on specific precedent of the Fifth Circuit.

557; *accord Burdine*, 450 U. S. at 254-55; *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019), *as revised* (Dec. 10, 2019) and *as revised* (Dec. 23, 2019) (citing *Reeves*, 530 U.S. at 142).

If the employer satisfies its burden, "the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose." *McCoy*, 492 F.3d at 557. Plaintiffs have two alternatives to refute the employer's articulated reason by offering evidence sufficient to create a genuine dispute of material fact. *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004). Through the mixed-motives alternative, they must show "that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic." *Id*. Through the pretext alternative, they must show "that the defendant's reason is not true, but is instead a pretext for discrimination." *Id*. Under this latter alternative, they must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.

With respect to the claims of disparate treatment and retaliation in this case, Plaintiff presents no direct evidence of discrimination or retaliation. Accordingly, the *McDonnell Douglas* framework applies to those claims. Furthermore, this is not a mixed-motives case.

## A. Disparate Treatment

Although Plaintiff primarily asserts that she suffered disparate treatment because of her sex when she was terminated, she also claims disparate treatment when she was not initially selected for the narcotics position. This latter claim necessarily fails because Plaintiff has made no attempt to show that the selected male was similarly situated. *See Refaei v. McHugh*, 624 F. App'x 142, 146 (5th Cir. 2015) (per curiam) (recognizing that prima facie case requires evidence

of "similarly situated" comparators). That a male was selected instead of her is simply not enough. Nor is her statement that several deputies on the board said she was rated first.

And with respect to her primary claim of disparate treatment, her termination, Defendant argues that Plaintiff has not satisfied the third or fourth elements of her discrimination claim, even though it recognizes that it terminated her. Despite the argument, there is no question that Plaintiff suffered a materially adverse employment action when Defendant terminated her. *See*, *e.g.*, *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 710 (5th Cir. 2016); *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013). Further, because the official reason for termination was an alleged violation of work rules and regulations and related insubordination in failing to follow a direct order, Plaintiff need only show for her prima facie case that she did not violate any rule or regulation or disregard an order. By averring that she was not untruthful regarding the warrant and that she followed an order from Sergeant Cantu, she has created a genuine dispute of material fact as to whether she violated a work rule or engaged in insubordination. She has thus satisfied the initial burden imposed in *McDonnell Douglas*.

That Defendant contends that the termination was based on her untruthfulness rather than because of her sex does not address Plaintiff's burden to establish a prima facie case. However, because Defendant has provided evidence to support that contention, it does satisfy its burden to articulate a legitimate, nondiscriminatory reason for the adverse action. "It is sufficient if the defendant's evidence raises a genuine [dispute] of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse action]." *Tex. Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 255 (1981). Plaintiff objects to some proffered evidence as hearsay, but even without the alleged objectionable evidence, Defendant has carried its burden of production. The

Court thus has no reason to definitively determine whether the evidence is hearsay under Fed. R. Evid. 802 or whether it qualifies as an exception under Fed. R. Evid. 803.

Once the defendant carries that burden, "the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 900-01 (5th Cir. 2012) (quoting *Burdine*, 450 U.S. at 255) (footnote omitted). In other words, "the inquiry . . . turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516 (1993).

At all times, the "plaintiff retains the burden of persuasion," and once the defendant has carried the burden to articulate a legitimate, nondiscriminatory reason for the adverse action, the plaintiff "now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Burdine*, 450 U.S. at 256. This opportunity does not stand apart from "the ultimate burden of persuading the court that she has been the victim of intentional discrimination"; instead, they merge together. *Id.* The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (citing *McDonnell Douglas*, 411 U.S., at 804-05).

Plaintiff proceeds through the indirect route. And through that route, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 255 n.10). But just because the Court may still consider such evidence, does not mean that the evidence will necessarily carry the ultimate burden to show intentional discrimination. *See id.* at

146-47. "That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of [discrimination] is correct." *St. Mary's*, 509 U.S. at 524. Plaintiffs do not carry their burden merely because they have persuaded the factfinder "to disbelieve the employer," they must also persuade the factfinder to believe "the explanation of intentional discrimination." *See id.* at 519.

Nevertheless, it remains "*permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147. Disbelief of the employer's stated reason "may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's*, 509 U.S. at 511. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. In some "circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id*. The key is whether the "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false," persuades the "trier of fact to conclude that the employer unlawfully discriminated." *Id*. at 148.

In her brief concurring opinion, the late Justice Ginsburg crystallized the essence of the reasoning in *Reeves* and *St. Mary's*:

> As the Court notes, it is a principle of evidence law that the jury is entitled to treat a party's dishonesty about a material fact as evidence of culpability. Under this commonsense principle, evidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation. Whether the defendant was in fact motivated by discrimination is of course for the finder of fact to decide; that is the lesson of [*St. Mary's*]. But the inference remains—unless it is conclusively demonstrated, by evidence the district court is required to credit on a motion for judgment as a matter of law that discrimination could not have been the defendant's true motivation.

14

*Reeves*, 530 U.S. at 154-55) (Ginsburg, J. concurring) (citations omitted).

The Plaintiff in this case has satisfied the truncated prima facie case applicable in a work-rule-violation case. By her own sworn declaration, she has also shown a genuine dispute of material fact regarding whether her employer's proffered reason for her termination is unworthy of credence. Both the prima facie case and the proffered reason for termination depend on the legitimacy of the proffered reason. Evidence that the employer chose to provide a false reason for terminating Plaintiff provides a potential rational basis to infer that the employer is masking an illegal motivation. But here, Plaintiff's prima facie case does not include any showing that she was replaced by a male or that she was treated less favorably than other similarly situated male employees. Because the prima facie case does not include any connection to Plaintiff's sex, it does not assist in showing intentional discrimination in this case.

Furthermore, Plaintiff's "ultimate burden" depends on whether "the actual decisionmaker was motivated by [Plaintiff's sex] in taking the adverse employment action." *Turner*, 675 F.3d at 902. The only evidence Plaintiff presents to show that Chief Wibert may have had the required gender animus lies with his refusal to assign her to an outside taskforce upon request by another law enforcement entity when he had previously done so for a male officer. The problem with this evidence is that Plaintiff fails to show that the male officer was similarly situated to her. Without such evidence, one must resort to speculation that Plaintiff's sex motivated Chief Wibert at all. Plaintiffs do not carry their ultimate burden when their presented evidence requires the Court to indulge in speculation.

Although there is a factual dispute between the parties as to the truthfulness of the Defendant's stated reason for terminating her, Plaintiff has not shown that the stated reason, even if untruthful, is a pretext for discrimination. There is a permissible inference, but to make that in-

ference reasonable in this case, Plaintiff must provide evidence to create a genuine dispute as to whether her sex motivated Chief Wibert's adverse employment action. Because Plaintiff has presented no such evidence, the Court finds no genuine dispute of material fact as to whether a gender animus motivated the Chief's termination decision. Viewing the record as a whole in the light most favorable to Plaintiff, the Court cannot find that a rational trier of fact could render a verdict in her favor on the facts presented to the Court.

For these reasons, Plaintiff has not carried her burden to show that any disparate treatment claim should proceed to trial. Defendant is entitled to summary judgment on such claims.

## B. Retaliation

Plaintiff's retaliation claim also proceeds through the *McDonnell Douglas* burden-shifting framework. But for this claim, Plaintiff fails to establish a prima facie case of retaliation. There is no question that Plaintiff engaged in an activity protected under Title VII and that she suffered an adverse employment action. Plaintiff submits several undertaken activities that might qualify as protected activity. Similarly, she submits several employment actions that might qualify as adverse. Except as otherwise noted, and for purposes of summary judgment only, the Court will assume without deciding that her stated activities are protected by Title VII and that the employment actions all qualify as adverse. Nevertheless, her retaliation claim still falters for lack of a causal connection between any protected activity and an adverse action.

In her attempt to satisfy the causal element, Plaintiff relies on perceived temporal proximity between her protected activity and adverse employment actions. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S.

16

268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). Although plaintiffs may satisfy the causal connection element by showing a very close temporal proximity between the protected activity and adverse action, "a five month lapse is not close enough without other evidence of retaliation." *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). And while the Fifth Circuit has noted that "'a time lapse of up to four months' may be sufficiently close," *see id*. (quoting *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001)), a month after *Evans*, the Supreme Court cited two circuit decisions with approval that had held that three- and four-month periods were insufficient, *see Clark Cnty. Sch. Dist*, 532 U.S. at 273-74.

In June 2015, Plaintiff made a sexual harassment complaint on behalf of another female officer. But Plaintiff was selected for the gang unit that same month. That selection belies claimed retaliation and does not exhibit any retaliation for filing that complaint, even if Defendant knew of the complaint. Similarly, Plaintiff did not receive a sought-after position in the narcotics unit in January 2016, but there is no connection between her non-selection and any protected activity. And her selection to a similar position in April 2016 also belies any retaliatory intent.

Another investigation against Rocha commenced in May 2016 and Plaintiff claims that Rocha retaliated by filing a complaint against her. Although a complaint was made against Plaintiff, it did not lead to any adverse employment action. The complaint was instead found to be unfounded after investigation.

After Plaintiff filed her first EEOC charge in June 14, 2016, she did not suffer any arguable adverse action until after she received her right to sue letter on that charge a year later. The two months following receipt of that letter both involved refusals of Chief Wibert to allow her to

be assigned to outside taskforces. And then in September 2017, Wibert commenced the internal investigation about the search warrant incident, which ultimately led to her termination in February 2018. Of course, it is "utterly implausible" to find "that the EEOC's issuance of a right-to-sue letter—an action in which the employee takes no part—is a protected activity of the employee." *Clark Cnty. Sch. Dist.*, 532 U.S. at 273.

Furthermore, at the prima facie stage, "the plaintiff must produce at least some evidence that the decisionmakers had knowledge of [the] protected activity." *Manning v. Chevron Chem. Co. LLC*, 332 F.3d 874, 883, n.6 (5th Cir. 2003). When "the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." *Id.* Plaintiff may suggest that the letter provided her employer with its first notice of her EEOC charge, but she provides nothing to show that anyone affiliated with Defendant knew about the right-to-sue letter when Wibert took the listed actions. And if the Court presumes Wibert knew about the letter, it must also presume that he knew about the filing of the EEOC charge a year earlier. *See Clark Cnty. Sch. Dist.*, 532 U.S. at 273 (recognizing that "both Title VII and its implementing regulations require that an employer be given notice within 10 days of filing").

Under these circumstances, the receipt of the right-to-sue letter is immaterial to the temporal proximity analysis even though there is some temporal proximity between the taskforce refusals, the internal investigation, and the receipt of the right to sue letter. *See id.* And the asserted actions taken by Wibert a year after the EEOC filing are not in close temporal proximity to satisfy the third element of Plaintiff's prima facie case of retaliation.

Plaintiff commenced this litigation on September 14, 2017, the day after the police de-

partment commenced its internal investigation. Clearly, the investigation cannot be in retaliation for pursuing this federal action. Moreover, that the investigation culminated with Plaintiff's termination four-and-a-half months later is likewise not sufficient to show a causal connection standing alone and Plaintiff provides no other evidence of retaliation. Indeed, the internal investigation itself shows that Chief Wibert was contemplating adverse employment action before Plaintiff commenced this litigation. That an actual adverse employment action may occur shortly after the employer learns of civil litigation is immaterial when the employer was contemplating adverse action prior to learning of the suit. *See id.* at 272. "Employers need not suspend previously planned [action] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id.* Plaintiff has not carried her burden to show causality.

For all of these reasons, Plaintiff has not carried her burden to show a prima facie case of retaliation and Defendant is entitled to summary judgment on this claim.

## C. Hostile Work Environment

Title VII's proscription on employer discrimination includes "[t]he creation of a hostile work environment through harassment." *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 452 (2013) (Ginsburg, J., dissenting).[6] To succeed on such claim, "the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Vance*, 570 U.S. at 427. But liability for "workplace harassment depends on the status of the har-

---

[6] The Fifth Circuit attributes the quote to Justice Thomas's concurring opinion, but it is properly attributed to the dissenting opinion. Whether the cite is to the concurring or dissenting opinion makes no difference because the cited authority relies on prior Supreme Court precedent that supports the proposition. *See Vance*, 570 U.S. at 452 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 64-65 (1986)); *Boh Bros.*, 731 F.3d at 453 (recognizing that *Vance* cites to those two prior Supreme Court opinions).

asser," i.e., co-worker or supervisor. *Boh Bros.*, 731 F.3d at 452.

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance*, 570 U.S. at 424.

To hold an employer "directly liable for an employee's unlawful harassment," the Plaintiff must show that the "employer was negligent with respect to the offensive behavior." *Id.* at 427. "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998). This rule applies "to evaluate employer liability when a co-worker harasses the plaintiff." *Vance*, 570 U.S. at 427. Thus, "[t]o establish a hostile work environment claim," based upon conduct by a non-supervisory co-worker, the plaintiff "

> must demonstrate that: (1) she is member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege" of [the plaintiff's] employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action.

*Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).

When "the purported harasser is a supervisor," the plaintiff is not required to prove the fifth element required for mere co-workers. *Reine v. Honeywell Int'l Inc.*, 362 F. App'x 395, 397 (5th Cir. 2010) (per curiam). A different rule applies when "the harassing employee is the plaintiff's 'supervisor.'" *Vance*, 570 U.S. at 428. In those circumstances, the plaintiff seeks to hold the employer "*vicariously* liable for its employees' creation of a hostile work environment." *Id.* "In order to accommodate the principle of vicarious liability for harm caused by misuse of supervi-

sory authority," employers are "subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

If the harasser "is empowered by the employer to take tangible employment actions against the victim," then the harasser is a supervisor. *Boh Bros.*, 731 F.3d at 452. The Supreme Court, furthermore, has held that empowering an "employee to take tangible employment actions against the victim" means that the employee has been empowered "to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id*. at 431 (quoting *Ellerth*, 524 U.S. at 761).

To succeed on a hostile-work-environment claim that arises out of a supervisor's conduct, the plaintiff must establish (1) membership in a protected class; (2) unwelcome sexual harassment; (3) that was based on the protected characteristic; and (4) that it affected a term, condition, or privilege of employment. *See Boh Bros.*, 731 F.3d at 453. To satisfy the fourth element, "the harassing conduct must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (internal quotation marks, brackets, and citation omitted). Courts "use an objective 'reasonable person' standard to evaluate severity and pervasiveness." *Id*. (quoting *Oncale*, 523 U.S. at 82). And they look to the totality of the circumstance to determine "whether an environment is hostile or abusive." *Id*.

It can be difficult to assess whether actions constitute harassment because of sex as required for Title VII liability. *See id*. at 455 n.5. But, in general, "cruelty and irrationality typify harassment, prejudice, stereotyping and hostility." *Id*. The Supreme Court has emphasized "that the objective severity of harassment should be judged from the perspective of a reasonable per-

son in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)). This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Id.* Courts cannot simply look at words or actions isolated from their context or the "constellation of surrounding circumstances, expectations, and relationships." *Id.* at 82. "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Id.*

While no single factor is conclusive as to whether a work environment is objectively hostile, relevant factors include "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *EEOC v. WC&M Enter. Inc.*, 496 F.3d 393, 399 (5th Cir. 2007) (citing *Harris*, 510 U.S. at 23); *West v. City of Houston*, 960 F.3d 736, 742 (5th Cir. 2020) (per curiam). The interference must be unreasonable. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002); *Harris*, 510 U.S. at 23.

"Under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment." *WC&M Enter. Inc.*, 496 F.3d at 400. On the other hand, the Supreme Court recognizes "that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001). Because complained-of conduct "must be objectively and subjectively offensive," the victim must, not only "perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to

22

be hostile or abusive." *WC&M Enter. Inc.*, 496 F.3d at 399.

In this case, Plaintiff alleges that "Defendant has created a pervasively hostile work environment." First Am. Compl. ¶ 28. She makes no attempt to state whether she seeks to hold Defendant directly or vicariously liable. She identifies Rocha as an alleged harasser. *See id.* ¶¶ 14-17. Although she alleges that she "was subject to almost weekly harassment based on her sex (female) creating a pervasively hostile work environment," *id*. at ¶ 24, her amended complaint does not identify any other harasser.

In its motion, Defendant sets forth the five elements required to show a hostile work environment based on co-worker harassment. *See* Mot. at 7. While Plaintiff recites a laundry list of conduct based upon her sex during her nearly eleven-year tenure with the police department, she does not characterize the harassing employees as either supervisor or co-worker. Unless Plaintiff carries her burden to show that the harassing employee is a supervisor, she must show that Defendant "knew or should have known of the harassment and failed to take prompt remedial action." *Blair v. Brookshire Bros., Inc.*, No. 9:18-CV-00111-RC, 2019 WL 1119373, at *1, 3 (E.D. Tex. Feb. 7, 2019) (recommendation of Mag. J.) *adopted by* 2019 WL 1114869 (E.D. Tex. Mar. 9, 2019).

As recited in the background section, Plaintiff identifies several co-workers in relation to her asserted Title VII claims: (1) Sergeant Rocha, (2) Corporal Bell, (3) Coty Butcher, (4) Corporal Christiansen, (5) Chief Wibert, (6) Officer/Sergeant Cantu, and (7) Officer Hannah. Based on the summary judgment evidence, it is clear that Chief Wibert is a supervisor within the meaning of Title VII precedent. Although Sergeants Cantu and Rocha might qualify at various points in time, Plaintiff presents no evidence to show that they or anyone else qualifies as a supervisor. Consequently, other than Chief Wibert, the Court considers all identified officers merely as co-

workers for the hostile-work-environment analysis.

Whether these individuals are mere co-workers or qualify as a supervisor, Plaintiff must establish a prima facie case of discrimination which includes the same four initial elements. For mere co-workers, however, the prima facie case includes negligence as a fifth element. Defendant attacks the fourth element – whether sexual harassment affected a term, condition, or privilege of Plaintiff's employment. Focusing on the conduct of Rocha as Plaintiff set out in her amended complaint, Defendant argues that it investigated Plaintiff's complaint against Rocha and his complaint against Plaintiff but found them both to be unfounded. It presents evidence that Plaintiff had opportunities to advance within the police department and was twice chosen for advanced units. It argues that her ultimate termination was based solely on her lying to a state district judge and was completely unrelated to the alleged hostile work environment.

In response to the motion, Plaintiff sets out greater factual detail regarding her hostile work environment claim. She expands upon the harassing conduct of Rocha with numerous other events that she contends constitute sexual harassment. In reply, Defendant asserts that under the totality of the circumstances, Plaintiff has not shown a hostile work environment. Given the breadth of what Plaintiff presents in her declaration, it is helpful to consider the asserted harassment chronologically because in instances of multiple harassment, later harassment naturally builds upon that which preceded it.

Even though FTO Rocha engaged in inappropriate sexual conduct in October 2007, Plaintiff's grievance resulted in his replacement as her FTO. And, while his conduct was over the line, Plaintiff has not shown that it was so severe or pervasive to affect any term, condition, or privilege of employment. She has not shown that the harassment interfered with her work performance.

Plaintiff also experienced a gun/safety vest issue with Corporal Bell in October 2007. But she makes no attempt to tie this issue to her sex other than her unsubstantiated belief that the matter would have been handled differently with a male officer. Unsubstantiated beliefs do not make conduct sexual harassment.

Furthermore, although Plaintiff endured continued false rumors of sexual relations throughout 2007 and 2008, there is nothing of record to support finding that the rumors affected or interfered with her employment to any extent. In addition, the September 2008 email Plaintiff received from a co-worker's wife is an isolated incident that is only tangentially related to the work environment. With respect to the patrol-unit-assignment issue in late 2008, Plaintiff did not connect it to her sex, although she does suggest an inference that her sex played a role in the delayed assignment. Moreover, she did not make Defendant aware of such issue. She instead informally asked her Sergeant about it. Despite these events and occurrences, Plaintiff has not shown a work environment that unreasonably interfered with her work performance as of late 2008.

Plaintiff recounts a disturbing series of events in April 2009 when a male officer replaced her in an expensive investigator class because she was pregnant and might leave the department after the birth of the child. That stated reason exemplifies a decision made because of Plaintiff's sex. And it is severe enough standing alone to affect a term, condition, or privilege of employment. But Plaintiff does not identify anyone involved in the decision. She has not shown that the harasser was a supervisor. And she presents no evidence that she brought the matter to Defendant's attention. These failures as a whole eliminate Plaintiff's ability to hold Defendant liable for the sexually harassing conduct related to the investigator class. Furthermore, while isolated incidents can add to the totality of a harassing environment, this one appears better suited as a dis-

parate treatment claim.

Eighteen months later, Plaintiff received verbal counseling after an accident even though male officers often have accidents without receiving counseling. More than three years after that, Plaintiff received a "below average" rating, but she does not connect that evaluation with sexual harassment in any manner. Similarly, Plaintiff does not connect Mark Christiansen's insubordination complaint in February 2014 to her sex.

While Plaintiff's off-duty encounter with Cantu ten months later is certainly because of her sex, she filed no complaint about it and merely informally asked for advice from a Sergeant. Further, those harassing actions occurred when Plaintiff encountered him, in November 2014, "as a civilian" who had become intoxicated while she was working off-duty security. During the course of that evening, Cantu repeatedly made propositions and other sexual comments to her before ultimately bribing her for sex with an offer for an assignment in the narcotics unit. Such a bribe is generally concerning, but Plaintiff has not shown that Defendant vested Cantu with any authority to take any tangible employment action against her. And she has also not shown that her employer knew or should have known of the incident.

In March 2015, Plaintiff received additional counseling for being late to work when male officers have been late without receiving counseling. A couple of months later, two complaints were made against Plaintiff, but she connects neither of them to her sex. The next month, Plaintiff made a sexual harassment complaint on behalf of Officer Werthen for alleged harassment by Rocha. She did not file a grievance on this matter, but Rocha pursued an unfounded complaint against her. Despite all of these additional events and occurrences, Plaintiff has not shown a work environment that unreasonably interfered with her work performance as of June 2015, the same month that she was selected to the gang unit.

Although Plaintiff was not selected for the narcotics unit in January 2016, she did not file a grievance about the non-selection. However, she was selected for that unit in April 2016. This selection also shows that her work environment was not unreasonably interfering with her work performance.

While the Court has considered Plaintiff's job tenure in segments, it does so in part to show whether the work environment progressed to a hostile work environment as the harassing issues build from event to event. But in this case, the most pervasive aspect of harassment occurred in 2007 and 2008. Plaintiff, however, has not shown that the harassing conduct during that time or afterwards was sufficiently pervasive to alter the conditions of her employment and create an abusive working environment. She fails to connect some of her noted incidents to her sex. Some appear to be isolated incidents rather than being part of a pervasive hostile work environment. While she does identify one specific event that appears sufficiently severe to create an abusive working environment, she has not shown that her employer knew or should have known of that incident. For these reasons, Plaintiff's hostile-work-environment claim based upon harassment from co-workers fails.

As part of her hostile-work-environment claim, Plaintiff also seems to rely on conduct by her supervisor, Chief Wibert. Through April 2016, Plaintiff only mentions him once – when he disciplined her for the EKG-strips incident in February 2014. She next mentions his involvement in July and August 2017, when he refused two requests that she be assigned to an outside task-force. His only other named involvement is with respect to the internal investigation commenced in September 2017 leading to Plaintiff's termination in February 2018. The Chief's actions do not appear to rise to the level of harassment, let alone severe or pervasive harassment. At most, they instead appear to be specific instances of perceived disparate treatment.

Even if considered as harassment, these acts are infrequent in nature. While some acts may have invoked some humiliation, there is nothing about the discipline in 2014 which is connected to her sex. The Chief made no reference to her sex when disciplining her or is there any indication in the record that her sex received any consideration in the discipline. Similarly, when the Chief refused to assign her to either of the two outside taskforces in July and August 2017, he did so because (1) "if he would send anyone, it would be who he wanted to send, not who they requested" and (2) "if he sent anyone, it would not be [Plaintiff]." Pl.'s Decl. 11-12. With respect to the first refusal, Plaintiff avers that his reason conflicts with what he had done previously when the FBI requested a specific male officer. *See id.* Although she attempts to connect the first refusal to her sex, she merely points out an inconsistency with the reason and a prior similar request. The Chief made no statement that it was because of her sex or that her sex had anything to do with his refusals. Plaintiff provides insufficient evidence to infer that his refusals were based on her sex. And, as already discussed in the disparate treatment section, the investigation leading to Plaintiff's termination provides no basis for a disparate treatment claim on the facts presented. Similarly, the investigation and termination add little to finding a severe or pervasive environment of sexual harassment needed to succeed on a hostile-work-environment claim.

Considering the totality of the circumstances, the Court finds no severe or pervasive sexual harassment by Chief Wibert that created an abusive working environment. Accordingly, Plaintiff's hostile-work-environment claim for vicarious liability based upon harassment by Chief Wibert fails to survive summary judgment. To be exceedingly clear, the Court has considered all of the circumstances that Plaintiff sets out as creating a hostile work environment and finds that, under the totality of the circumstances from 2007 through 2018, Plaintiff has shown no sufficiently severe or pervasive harassing conduct by Chief Wibert or her co-workers that al-

ters the conditions of her employment and creates an abusive working environment. Accordingly, Plaintiff's hostile-work-environment claim fails, and Defendant is entitled to summary judgment on this claim.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** *Defendant City of New Braunfels' Motion for Summary Judgment* (ECF No. 39). On the facts presented, Defendant is entitled to summary judgment on each claim Plaintiff has raised in this action.

**SIGNED this 17th day of November 2020.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**